Shauck, J.,
dissenting. In two cases! under the above title original petitions in mandamus' were filed here, one to compel the secretary of state to place upon the ballot to be . voted at the general election in November, 1913, an act popularly known as the Kilpatrick act, and the other to compel him to place upon the ballot an act popularly known as the Warnes act, in order that the electors might, in the exercise of the power reserved in the recent amendments to the constitution, determine whether the said acts should become laws or not. Petitions for the referendum of both of said acts had been filed with the secretary of state in due time, one of them bearing as the signature of .electors 17,916 names more than the per cent, required by the constitution and the other 20,619 in excess of that requirement. In his petition for mandamus the relator first relied upon the proposition that such petitions for referendum having been filed as to both acts in due form and appearing to be signed by a sufficient number of the electors, and neither of them having been impeached by any tribunal authorized to subpoena witnesses or determine the competency of evidence, or to administer oaths,1 or to exercise any other judicial power, the defendant was without authority except to place the , acts . upon the ballot in order that the electors of the state might exercise their reserved right- to determine whether they should become laws.
■ On demurrer,. six of the seven members of this court concurring, it was held that the defendant, although a mere ministerial officer clothed with;no judicial authority whatever, might for himself, de- *330 ■ termine that the petitions for referendum were in- : valid because of the presence of spurious signatures and genuine signatures of persons not electors, and a vote of the electors. That the conclusion of the .¡majority in that regard is erroneous is, I think, . upon that finding might refuse to submit the acts to ■ made entirely clear by the constitutional provision defining the effect of a referendum petition filed with the secretary of state and by an unanswerable ' authority. The constitutional provision, being in • Section 1 g of Article II, is: “The petition and signatures upon such petitions, so verified, shall be pre- ' sumed to be in all respects sufficient, unless not later than forty daj^s before the election, it shall be otherwise proved.” It cannot be otherwise “proved” except by the determination of a tribunal authorized ■ to compel- the attendance of witnesses and the production of all material evidence, to determine its ■ competency and to judicially determine its probative value.
Since an original statement of my reasons for this conclusion might, under the circumstances, ,: make them appear to be peculiarly my own, and as ' I find them very satisfactorily expressed in the au- ' thoritative decision referred to, I quote them from that decision at some length. It is the case of The State, ex rel., v. Olcott, 62 Or., 277. The state of • Oregon is the home of the referendum and its supreme court has a high standing among the courts ’ of the country. The precise question under consideration in the case cited was, whether a court of equity had jurisdiction to determine the legal suf•ficiency of a petition for a referendum and to enjoin *331 the secretary of state from placing a statute, upon the.ballot if it should, judicially determine that the petition was legally insufficient, that is, determine that it was “otherwise proved.” The lawyers co,m-. posing. that court were mindful of, the rule ■ that. a court of equity may not intervene if legal remedies are adequate and that the suit.in equity to enjoin, could not be maintained if the secretary of staters, vested with authority to determine that a petitio,n apparently sufficient was nevertheless legally .insuf-, ficient. And the court recognized that it resulted from that obvious view that the suit in equity must fail if the secretary of state had authority to cletermine that it was “proved” that a petition, ap-, parently sufficient was really insufficient, so that the, logical question there considered was precisely, the question presented in these cases. It demonstrated the impotency of the secretary of state to conduct such inquiry in the following language: “On be-.. half of defendant it is contended that, by the words ‘legally sufficient,’ as here used, it is meant that the pétition shall be regular upon its face, and that, if a. petition, regular upon its face, shall, be presented,’’ the court cannot go behind its apparent regularity, to inquire into its genuineness. We cannot assent to this view. It is conceded that there is no power granted to the secretary of state to call witnesses and examine into the facts to determine the validity of any petition. His powers are not judicial, but, ministerial; and if.this power does not reside in the. courts a petition, consisting wholly of forged.names, can be presented, and the public put to the- expense of printing the measure and:submitting it to a vote, *332 This would' be giving a forced and unnatural construction of the law in favor of fraud. The legislature never contemplated such a vicious construction. We are of the opinion that by the term ‘legally sufficient’ the legislature meant to describe a valid petition, signed by legal voters, and complying substantially, not necessarily technically, with the requirements of the law.” Having thus demonstrated that'the court was authorized to determine the sufficiency bf the petitions because the secretary of state was impotent in that regard, they proceeded to a review of the questions affecting the sufficiency of the petitions in the case before them. That the constitutional provision gave to these petitions prima facie effect of enjoining .upon the defendant the imperative ministerial duty of placing these acts upon the ballot and that they have never yet been challenged before any tribunal authorized to determine their sufficiency in fact, or to purge them of spurious names, are propositions of such obvious soundness as to show without further inquiry that peremptory writs should have issued in both of these cases. Indeed, it appears in the case of Pfeifer et al. v. Graves, Secretary of State, 88 Ohio St., 473, decided October 14, 1913, that this court is unanimously of the same opinion. In that case suit was brought in the court of common pleas to enjoin the secretary of state from placing a legislative act upon the bállot to be voted at the same election in order thát by a referendum vote the electors of the state might determine whether it should or not become ¿'law. That'the injunction in that case should be denied was the conclusion in the court of commbn *333 •¡pleas, in the circuit court and here, but-the propriety of the‘-remedy by injunction to restrain'the secretary-of state- from placing upon the ballot-ah-act of the-legislature,--which is not the proper subject ■of a referendum' vote, was • recognized in alb the courts and' by all the judges. Even the novitiates at the bar are aware that if the- secretary -of state has authority -to-determine a question of this character, the courts are without authority to control him by injunction. Why the majority .in ¡these two cases rejected the view taken by the supreme-court of Oregon, which they accepted in the decision and ..report-in Pfeifer v. Graves, published in-the following Ápril, has not been stated, nor is it within the -range of my-¡conjecture. In view of the decisions of the supreme court of Oregon and-this court, ' in the cases cited, the conclusion of this court with respect to the Warnes and Kilpatrick acts seems to be clearly violative- of both principle and precedent.
It is opportune .to advert briefly to some considerations which were -developed before the secretary ,,of state, and here, after that official started out to ■usurp the authority.of -the courts. To an understanding of his conduct, which seems to have the commendation of the majority of this court, it is not necessary to analyze the tomes which record what transpired before him or to point out the multiplicity of challenges to the same alleged defects in the petition, or. how the apparent ■consideration of three petitions for the referendum of three different statutes were blended so as to create confusion, or to repeat the narratives of thdse ■ investigators” who took copies of petitions, some *334 times with the signers’ names incorrectly given, and went out to see how many of the signers, and their residences they could not find, or the testimony which was mere hearsay, or statements concerning facts which from their nature the narrators could not know. The relator’s request that witnesses who personally knew the facts to be contrary to those statements should be called to testify to the truth was met by the defendant’s statement that he was without power to subpoena witnesses—a fact perfectly well known before he started upon the pretended inquiry. It was in general a proceeding conducted in defiance of the rules of orderly procedure by which the competency of evidence and its probative value are determined. The character of this pretended inquiry is sufficiently apparent from the testimony of the defendant himself before us and from the entry which he saw fit to make respecting his conclusion after many days of such pretended inquiry. Both his alleged finding and his testimony show that he did not attempt to determine from the so-called evidence that had been presented to him that it had been proved that these petitions, which apparently bore many more signatures than were required, were not sufficient in fact because of improper signatures which they contained. His finding contains no analysis of the “testimony” to show that the valid signatures to the petitions were insufficient, and he concludes “that all the petitions filed are so permeated with fraud, corruption and crime that they constitute one solid mass of wrongdoing and it ought to be so held.”
In his testimony before us occurs the following: *335 “Q. And you didn’t consider the valid signatures that were upon the petitions that had not been questioned, in making up your decision? A. Well, now, I will tell you. When you asked me if I didn’t consider the valid signatures my conclusion was that the whole thing was so rotten that there was no validity attached to it at all as a whole.”
A ministerial officer, having started upon a career of usurpation, seems to have assumed the jurisdiction which in this state belongs originally only to the court of common pleas, and he also assumed authority to deal with the moral aspects which he supposed were involved in the subject before him and then to exercise the jurisdiction of the probate court by constituting himself the guardian of “the principle of the referendum,” for he finds: “Again, it is clear that the forces who interested themselves in the procuring of these petitions and their filing in this office are the very forces who strongly opposed the adoption of the constitutional amendments that authorized the initiative and referendum, indicating clearly that the only purpose in their whole procedure was to attempt to discredit the principle of the referendum.” It is quite apparent that in his capacity as guardian of the principle of the referendum he has dissipated the estate of his ward, for if the referendum of legislative acts can be defeated by methods which have prevailed in these cases, then certainly the referendum is a delusion.
This record leaves no doubt whatever but that the conclusion just stated was attractive to the defendant and that he reached it only because of its attractiveness, because nothing occurred during the *336 whole examination to impel his mind in that direction.' On the contrary, the voluminous petitions, the long struggle to secure the submission, to a .'refer r endu'm vote; the labor, time and money expended in procuring'petitions largely iri: excess pf; those. required by the constitutional provision, show only the great desire of the petitioners that a referendum upon these acts should be had.
- ' The memorandum filed with the clerk of- this .cóürt by a majority of - its members to explain the •decision naturally partakes largely of the nature :cf the proceedings beforé the defendant. : From the1 wide 'domain of the law and the; supplemental ■system of equity the six who compose the-majority have gathered a fund of learning, so vast that, without confusion, it cannot be exhausted in the determination'of a single case. First, it.-is said that)orie who seeks a writ of mandamus must show a,-clear legal right thereto. This is a correct arid lawyer-like statement of the only test known to the law-iof this state.." With that requirement the relator in the present cases shows his compliance" by presenting petitions for the referendum containing many more signatures of electors than were required, and ■although there were attached to the petition names that'were riot entitled to be-co'unted,' nooftepretends “that the excess above the" six per cent, required was ¡equaled or approached in numberstby those .that were not entitled’ to be counted,. and- no '.tribunal, authorized or unauthorized, has., found that it was proved that 'these petitions were not .sufficient, wit ■may have been’in recogriition- d'f ■ th'e 'relator’s .-full ■.'ebm'pH^Ne with that réquirement that, a- step fur *337 ■ther‘."is taken, and it is said “It is a fundamental principle of equity that he who seeks the aid of a court of equity must come into court with clean ■hands.” That this maxim of equity cannot with propriety be applied to a prerogative writ needs no demonstration, for it appears from its own terms. This maxim of equity throughout the generations has contributed most efficiently to'the administration of justice in the field of equity, but it will not submit .to impressment into an alien and menial service. The attempt by which this maxim of equity ■is .sought to be made applicable to the present case might, I think, with entire safety be left to what has been said upon the subject by the majority. They recognize that' so careful was the relator in these cases that'he withheld petitions containing'40,000 names because he suspected the genuineness or validity of' some of them. The suggestion that for thé sake of obtaining signaturés largely in excess ■of those'required by the constitutional provision-he ■ perpetrated or connived at fraud with respect to even one name would hardly commend itself to.one who considers the evidence in the case impartially. Indeed,'such care was taken to present only genuine signatures' to the secretary of state that the real mysteryof the case is, how it came about that there ómdeniably' aré some signatures not entitled to.be •counted.1 The so-called evidence in these, cases does nbt'disclose how they -found their way into the petition1.' One engaged in showing the superiority of the judicial modes of inquiry-is not permitted to¡ indulge in1 conjecture; This mystery must be/left to .théjjistórianá!bf the nether wdrld,/ >' >'■ ■
*338 The opinion which the majority has filed with the clerk attracts some further attention. A court may, if it thinks it worth while, bestow compliments upon the personal character and conduct of a litigant to whom it denies relief because of some imperative and harsh rule of law, but not when it denies him relief because of his misconduct. Both the selection of this maxim of equity and the effort to make it appear relevant to the present case are irreconcilable with the rational administration of. justice.
No progress toward the conclusion announced is made when it is said that the defendant did not act fraudulently, for fraud is not bold, and it was well known when he undertook what he calls an .investigation that he was without authority to subpoena witnesses, or to administer oaths, to contradict the narratives of the “investigators.” Nor does it aid the conclusion announced to say that the defendant did not abuse his discretion, for it is entirely clear from the general principles of the law applicable to the duties of administrative officers that he had no discretion; and this is inade entirely clear in State, ex rel., v. Olcott and Pfeifer v. Graves. When the safe guidance offered by the landmarks of these cases was rejected by the majority, naturally the opinion and the conclusion which it accompanies, but does not sustain, should recall the “Hunting of the Snark,” where is recorded the grotesque failure which attended an attempt at navigation in exclusive reliance upon a “lárge map representing the sea without the least vestige of land.”
It would be difficult to overestimate the consequences which would naturally follow this plain *339 departure from the constitutional provision. Whether it was intended by those who promoted the referendum or not, its undoubted effect is to relieve legislators of a sense of responsibility for the acts which they pass. Philosophically, legislative acts upon which a referendum may be had are only proposals of legislation, and members vote for them with the understanding that if they are not satisfactory to the electors of the state, they may by referendum defeat them. It is pertinent to inquire whose will is represented in these enactments. They now stand upon the books as laws of the state. They do not represent the will of the legislative bodies of the state, and the expression of public opinion with respect to them has been defeated by official action in plain violation of law, permitted by the judgment of this court.
These cases will never be cited by those who delight in the assurance that we have a government of laws. Perhaps it should not have occasioned surprise that when the majority announced in these cases a conclusion which disregarded all the precedents, an unprecedented mode of breaking the information to the public should be adopted by filing an opinion with the clerk instead of the reporter.
The regret with which I at first regarded this unprecedented course in filing an opinion with the clerk has yielded somewhat upon reflection. Since those who control the national reporting of judicial opinions have no arrangements with our clerk for procuring copies, such as they have with our reporter, we may be spared some humiliation by the reflection that the judicial literature respecting this *340 discreditable incident in the history of the state is confined to its own borders.
Since the foregoing statement of reasons for rqy dissent was filed with the clerk, and eight months after the court announced its decisions in the two cases to which it refers, the majority have furnished to the reporter an opinion containing some addition to the statement of views which they then filed with the clerk. With commendable fairness the responsibility for this opinion is distributed equally among the majority by giving it the form of a per curictm. It includes, case No. 14422, in which I did not participate and respecting which I express no opinion.
In the later opinion there is some addition to the volume of that originally filed with the clerk by the majority, but no justification of the conclusions announced. The provision of the statute relating to the duties of the secretary of state when “acting as state supervisor of elections” and the cases cited are, by their express terms, made inapplicable to duties which the constitution imposes upon the secretary in his general character as an administrative officer of the state. It surely cannot be necessary in this connection to say that words respecting provisions and rules of law which are entirely clear do not add to their clearness. They may, however, add to the impressiveness of the admonition .thqt subordination to the law is most important rin. a court which is not otherwise subordinate.